## THE MARGARET B. ROPER.

(District Court, D. South Carolina. August 2, 1900.)

1. COLLISION—SUIT FOR DAMAGES—TESTIMONY OF SEAMEN.

The testimony of seamen on a ship sunk in collision, as to the manner of such collision, is not to be discredited because of their personal interest in the suit on account of their claims for loss of effects, such fact being no more likely to affect their testimony than the bias most seamen have in favor of their own ship.

2. SAME—PRESUMPTION OF FAULT.

The fact that one of two vessels sailing on crossing courses was struck by the other and sunk raises no presumption that the survivor was the one in fault for the collision.

3. SAME—SAILING VESSELS CROSSING—EVIDENCE CONSIDERED.

Evidence relating to a collision at sea in the night between two schooners considered, and *held* not to sustain the contention of the libelant, whose vessel was sunk, that the two vessels met on parallel courses, and that the collision was caused by a change of course on the part of the libeled vessel, but to support the claim of the latter that she was sailing closehauled on the starboard tack on a course crossing that of libelant, and that she held her course, which, as the privileged vessel under navigation rule 14, she was required to do, and was not, therefore, in fault for the collision.

In Admiralty. Suit for collision.

Nathans & Sinkler, for libelant.
Bryan & Bryan, for respondent.

BRAWLEY, District Judge. The case for the libelant is that, sailing closehauled on a course to the north, with the wind northwest by west, she was sunk by the claimant, heading south, and sailing free. The case for the claimant is that she was sailing closehauled on the starboard tack, on a course southwest by south, with the wind west by north. Whatever may be the truth, there was such "risk of collision" as brought into operation the sailing rules embodied in article 14 of the international regulations, which are as follows:

"Art. 14. When two sailing vessels are approaching one another so as to involve risk of collision, one of them shall keep out of the way of the other as follows, namely: (a) A ship which is running free shall keep out of the way of a ship which is close hauled. (b) A ship which is close hauled on the port tack shall keep out of the way of a ship which is close hauled on the

starboard tack. (c) When both are running free, with the wind on different sides, the ship which has the wind on the port side shall keep out of the way of the other. (d) When both are running free, with the wind on the same side, the ship which is to windward shall keep out of the way of the ship which is to leeward."

The Fannie Brown, a schooner of 430 net registered tonnage, was heavily laden with phosphate rock, bound from Charleston to Baltimore, making four or five knots an hour. The Margaret B. Roper, a schooner of 393 net registered tonnage, partly laden with 100 tons of sulphur, bound from New York to Charleston, was making about seven knots an hour. There was a wholesale breeze of about 14 miles an hour, and the collision occurred about 8 o'clock on the night of December 26th, at a point about 25 miles northeast of Cape Hatteras, the night being starlight. The Brown, with everything on board, sunk shortly after the collision, all hands getting aboard the Roper, which swung alongside. The mere fact that one vessel is sunk, and that the other survives a collision claimed to have occurred on crossing courses, is not of itself a circumstance which aids in the determination of the fault, for the vessel that arrives first at the point of intersection is generally the sufferer, and that is a matter of chance and of a few seconds. The burden of proof, therefore, rests upon the libelant here, but I do not give much weight to the contention of the claimant that the testimony of his witnesses is to be discredited because of their interest, each of them claiming some compensation for loss of personal goods. It would be a hard case if the same blow that caused the injury should at the same moment strike down the only testimony competent to prove it. An unvarying experience shows that the testimony of all seafaring men is affected by the supposed interest of the ship they sail on, and the truth as to any happening at sea is to be ascertained, if at all, not by weighing the number and bias of witnesses on one side against the number and bias of witnesses on the other side, or by attempting to reconcile testimony generally irreconcilable, but by taking certain conceded or well-proved facts, or facts established by disinterested witnesses, and from them deducing such conclusion as seems to accord best with the probabilities of the case. The fact not disputed in this case is that the Roper struck the Brown on the starboard side in her forerigging, cut her through, and knocked off the after-part of the forward house, the jib, fore staysail, and headgear forward of the foremast, and all the staysails remaining in good condition and uninjured after the collision. The forward house was about 12 feet long, the foremast passing through it about 2 feet from the forward end, and was about 6 or 7 feet from the rail. The fore staysail had a boom about 22 or 23 feet long, which swung within 5 feet of the rail. The master of the Brown being asked, "Did she strike you a glancing blow?" answered, "She struck a pretty solid blow." The mate, being asked a like question, answered that he did not think it was a glancing blow. Cannon, the steward of the Brown, standing on the fore hatchway, on the starboard side, about 12 feet aft the foremast, and about a foot and a half away from the after-end of the forward house, says that a very few seconds before the collision he saw both "lights of the Roper, and

judged that she would come between the cat and the forerigging."
This witness has drawn a diagram, which is in evidence, marked "Exhibit F," indicating what, in his view, was the line upon which the
Roper approached the Brown. The angle of incidence therein is about
50 degrees. The lookout on the Brown says she was struck "in the
forerigging." After the collision the vessels swung round and lay
alongside, bow and bow. The Roper was examined by the court during the hearing, and the testimony, confirmed by such personal inspection, shows that her stem was considerably bruised, and that
there were bruises on the starboard side above the main deck, and
indentations of probably a half inch from a point about 5 feet aft to
about 12 feet aft the stem. There were some bruises on the port side,
and a hole where the wood showed some decay, and the testimony is
that the lumber ports on both starboard and port sides had been broken
in. As the Brown was heavily laden, she was probably about 5 feet
lower than the Roper. It is therefore clearly established that the
Roper struck the Brown at an angle more or less considerable. Cranmer, the master of the Roper, estimated it at about five points, which
is about the angle given in Cannon's diagram. Neither the master
nor mate of the Brown testifies on this point. In the collision all the
head sails of the Roper, her jib boom, and martingale went, and the
testimony is that among the wreckage picked up was this martingale
and a sheer pole claimed to be that of the Brown. This martingale
and sheer pole were offered in evidence. The sheer pole was of iron
of about an inch thickness, wrapped with tarred twine, and is of three
links, each about $3\frac{1}{2}$ feet in length. One of the links of the sheer pole
produced is bent in the form of a loop, and this loop fits over the
lower end of the martingale. In the crown of the loop the twine is
broken and abraded, and the contention is that these abrasions were
caused by the jumper chains which run from the lower end of the
martingale to the jib boom, which chains, the testimony shows, were
broken. Inasmuch as the sheer pole on the Brown, as on all vessels,
runs fore and aft, this loop bears silent but pregnant testimony to the
fact that it must have been caused by some hard body of about the
diameter of this martingale pressing against it at such an angle of
incidence as to bend rather than glide from it. The genuineness of
this sheer pole is questioned because some of the libelant's witnesses,
who were in a position to see, did not see it; but the man who fished
it up with the other wreckage testifies positively to its being taken
from the water; and Capt. Lamson, who saw it produced in court, and
who had opportunity to do so, has not denied that it belonged to the
Brown. The practical difficulty in the way of the fabrication of such
a piece of testimony, the chances of exposure, and the serious consequences that would be likely to follow such attempts, with the intrinsic signs of genuineness in the thing itself, all compel the acceptance of this evidence. My conclusion upon this branch of the case,
in which there is little or no conflict of testimony, is that the Roper
must have struck the Brown at an angle of from 35 to 50 degrees.

Next will be considered the account of the collision as detailed by
the chief witnesses for the libelant. Lamson, the master, standing
on the lee quarter of the Brown, testifies to seeing the red and white

lights of the Roper ahead, between his forerigging and jib boom, the Brown on a course north, the Roper coming straight on a course south until within a length, when the Roper ported her wheel and luffed, striking the Brown just forward of the fore-rigging, cut her through, shoved her around, and came alongside. Drisko, the mate, testifies to seeing the lights of the Roper about a mile or a mile and a half ahead, a little on his starboard bow,—it might be one-half a point, not more,—until within about two lengths, when she luffed, striking the Brown as already detailed. Webster, the lookout on the Brown, says that he saw both lights of the Roper directly ahead until she came within a length, when she commenced to luff, and showed her red light. Lieut. Johnston, called by the libelants as an expert on other points, in reply to a question by the court, says that in the conditions above described, if the Roper had luffed at one or two lengths away, the Brown would have struck her upon the port side. That seems so obvious even to the nonnautical mind that counsel for libelant contends, and correctly, that estimates of distances at sea in the nighttime are not to be absolutely relied on. It follows, then, that the alleged luffing detailed as the cause of the collision must have been at less than one length, in which case it seems impossible that the Roper should have struck the Brown at the angle, and in the way that it is substantially established that she did strike her, or that she would have approached her on the line which Cannon, an intelligent witness for libelant, standing nearest to the point of collision, has described; for, if the Roper kept her course, there would have been an end-on collision. If she luffed, as described, and showed her red light one length away, the Brown would have run into her on her port side. If she luffed within less than one length, she could not have described a semicircle so as to strike the Brown, as proved. Drisko, the mate of the Brown, upon being recalled, drew a diagram representing the positions of the vessels just before the collision. In this diagram (Exhibit R) the Roper is placed about 2½ points off the starboard bow of the Brown. This is inconsistent with his testimony in chief, wherein he says that she was half a point, not more, on his starboard bow. Making due allowance for the fact that he is not an expert draughtsman, this changing of position is a circumstance tending to confirm the conclusion that, however this collision occurred, and to whosesoever fault it was due, it could not have occurred in the way it did if the two vessels were moving upon the courses described by the chief witnesses for the libelant.

An examination of the testimony in detail is now necessary. Accepting as true the statement of the libel that the Brown was heading northward, and going at the rate of four or five miles an hour, and being satisfied that each vessel kept its course, the question for decision is which had the right of way, and the solution of it depends upon the direction of the wind and the course of the Roper. I have said that each vessel kept its course. As to the Brown there is no dispute. As to the Roper there is a conflict. Witnesses for the libelant testify to a change of course a few moments before the collision, while witnesses for the Roper say that an order was given to port the helm too late to be executed, and that it was not executed.

If such movement was made, it was an error in extremis, and the fault, if fault there be, lies further back. It lay in keeping a course which she had no right to keep, and in not getting out of the way sooner, if it was her duty to keep out of the way. The testimony of witnesses on one moving vessel as to deflections in the course of another moving vessel is apt to be illusory from the natural disposition to regard your own vessel as stationary, the only moving object which the eye takes in being the other vessel. The man at the wheel on the Roper testifies positively that it was not turned so as to cause any deflection in her course; and all the witnesses on the Roper concurring in that, and inasmuch as such movement, under the circumstances, would have been an error, and not a fault, I am of opinion that the collision was caused by each vessel keeping its course, as each claimed the right to do; and the pivotal question remains, which had the right of way? If the Brown had the right of way, as she claimed, then the Roper is at fault, whether she luffed or not. What was the direction of the wind? Two witnesses only on board of the Brown—Lamson, the master, and Drisko, the mate—testify on that point. They say the Brown was heading north, and that the wind was northwest by west at the time of the collision; that at 12 o'clock, when they were 44 miles north and east of Diamond Shoal, the wind was about northwest, at 4 o'clock it was about northwest by west, and that after the collision it was a little northwest. The testimony of the witnesses of the Roper is that before noon on the day of the collision, the wind was from the northwest, it was canting down towards the west in the afternoon, and at the time of the collision the wind was west by north. That is the testimony of Cranmer, master, Stiles, mate, of Johansen, the lookout between 6 and 8, just before the collision, who says the wind was in his face, and that the Roper was sailing closehauled. Such, also, is the testimony of Johnson, and of Lunt and Bulkley. Johansen and Johnson are Swedes. Bulkley and Lunt have been from 25 to 30 years at sea. Mount, the master of the Horace B. Sheres, which had been sailing in company with the Roper all that day, and passed the two vessels just after the collision, within about 700 or 800 feet, testifies that the wind was northwest before noon, and that it canted more westerly in the afternoon, and that he had to trim his sheets to head his course, and that at half past 7 the wind was west-northwest when he took the wheel and trimmed his sheets, and that at 8:25 p. m., when he came to, to trim his vessel for the course round Hatteras, the wind was west one-half north, and that when he passed the vessels they were headed to the westward. Macon, captain of a vessel that was 30 miles southwest by west from Diamond Shoal lightship that night, testifies that the wind at that point at 8 p. m. was west-northwest, and that from his experience of about 25 years on the North Atlantic coast, when the wind is west-northwest south of Hatteras, it generally draws about a point and a half to about two points more north of Hatteras. Capt. Low, who testified to an experience of 15 or 18 years in sailing around Hatteras, says that with a northwest wind at Hatteras the wind has a tendency to draw to the north north of Hatteras and to the west south of Hatteras. The weather

report from Cape Hatteras, the weather bureau nearest the point of collision, gives the wind direction at 8 p. m. as west, and the velocity 14 miles per hour; velocity at noon being given at 16 miles, and no great variation from that time to the time of the collision. The extract from the daily journal of the observer at that point for December 26, 1899, is as follows: "Clear day, lower temperature, brisk westerly winds, heavy frost in the early morning." The report from Wilmington, N. C., the point south of Hatteras, gives the wind direction at 8 p. m. as northwest, and the wind velocity five miles per hour. The report from Cape Henry, Va., gives the wind direction at 8 p. m. as southwest, wind velocity eight miles per hour. The report from Norfolk gives the maximum velocity and direction of the wind from 8 a. m. to 12 o'clock noon at a velocity of 17 miles, direction northwest; from 12 noon to 4 p. m., maximum velocity 16, direction west; from 8 p. m. to 9 p. m., direction southwest. The report from Kitty Hawk, which is the station next north of the point of collision, a litle further off from the collision point than the station at Cape Hatteras, is that there were fresh northeast winds all day, giving the maximum velocity from 12 noon to 4 p. m. at 19 miles per hour, direction unknown. A detailed report of the wind directions at Kitty Hawk is not furnished. Letters from the chief of the weather bureau say that the observer at Kitty Hawk station does not make an observation of the wind at any particular moment, but notes from time to time the direction during the day, and records it in his journal, and that he does not make an observation of the wind at 8 p. m. It appears that this observation is confined to the daylight hours. Kitty Hawk is about 45 miles from the place of collision, Hatteras about 25. The records of Hatteras, Cape Henry, and Norfolk show a wind movement from the northwest in the morning, backing down to a west wind at 8 p. m. With this general concurrence as to the direction of the wind, I think that the report from Kitty Hawk, unsubstantiated by detailed observations, is not entitled to credence. It is contradicted in part by the testimony of Capt. Lamson and his mate, who testified that they were up in that direction at one time during the day on one of their tacks, and that the wind was from the northwest. The direction of the wind, therefore, as testified to by Lamson and Drisko, the only two witnesses for the Brown, is contradicted by six witnesses upon the Roper; by Mount, an independent witness, who gives in detail the circumstances which led him to note the direction of the wind; and in a general way is contradicted by the weather reports. It seems to me, therefore, that the libelant has failed to establish this essential part of his case by a preponderance of the testimony. The testimony of Mount, master of the Sheres, is conclusive against him, if it is to be accepted as true. Libelant seeks to break the force of his testimony on this and on another important branch of the case by suggesting and charging that Mount is not a disinterested witness; that he has such a bias in favor of the master of the Roper that he has perverted facts, and joined Cranmer in an effort to concoct with him a story which would save him from liability. There is no evidence that Mount has any interest in this case, or that he has any such relations with Cran-

mer as would lead him to testify falsely in his behalf. He himself
has said that his acquaintance with Cranmer was slight, and that
he had more friendly relations with Lamson than with Cranmer.
There was nothing in his demeanor while upon the stand to awaken
in my mind any suspicion that he was not telling the truth. His tes-
timony is impeached because it is said that his conduct in passing
these two vessels while they were in collision without stopping to
offer assistance shows him to be lacking in humanity, and that one
who, under such circumstances, exhibited such heartless indifference,
ought not, therefore, to be believed. I think that Mount, under the cir-
cumstances, should have stopped to see if assistance was needed.
He says that some hours afterwards he was conscious of his failure
to do the right thing, and regretted it; and it should be said in fair-
ness that no signals of distress were given him. However reprehensi-
ble may have been his indifference, I cannot say that such conduct
in itself stamps him as unworthy of belief, nor do I regard certain
discrepancies in parts of his testimony, which have been pointed out,
sufficient ground to discredit him upon the main point upon which
he has testified with such positiveness and with such details as seem
to me to make his testimony credible. His failure to answer a let-
ter written by Mr. Cohen, the agent of the Brown, asking for in-
formation, is also commented upon. I cannot say that such a re-
fusal justifies a reflection upon his veracity. It may be that he did
not wish to be troubled with the affairs of others. His conduct on
the night of the collision shows that he is a man more regardful of his
own convenience and interest than of the possible needs of others.
His appearance and manner, intelligence and experience, all seem to
me to give weight to his testimony. The testimony of Macon and of
Low that when the wind below Hatteras is from the northwest the gen-
eral direction north of Hatteras is likely to bend to the northward
does not seem to have much application, if the testimony of all of
the Roper's witnesses and of the weather bureaus that the wind was
westerly, instead of from the northwest, is to be believed, as I think
upon the whole that it is. If it be true that the wind was west by
north, then it would follow that the Brown, sailing due north, would
have the wind two points free, sailing, as the testimony shows she
could, within five points of the wind. The claim of the Roper is that
she was sailing closehauled on the starboard tack at the time of the
collision, the wind being west by north. The testimony is that when
light she sails within 5½ to 6 points of the wind. All of the wit-
nesses testify that down to about 10 minutes to 4 she was on a
south-southwest course; that at that time they came to, the captain
took the wheel, and they trimmed the vessel down closehauled, be-
cause they say that at that time the wind came more out to the west-
ward (specific details as to what was done at 4 o'clock are given in the
testimony); that they put down the center board, and jigged up the
peak, and that from that time to the time of the collision she was
sailing closehauled on the starboard tack southwest by south. The
testimony of Mount is that he passed Body Island light, whose visi-
bility is 18½ miles, about 16 miles to the eastward; that just before
dark he saw the Roper 5 or 6 miles east-southeast of him. Mount

testifies that he kept on a course south-southwest for about an hour, until Body Island light bore northwest; then changed his course to south, and, sailing there about an hour and a half, he saw the vessels in collision. All of the witnesses of the Roper testify to seeing the Sheres just before dark, and that she was five or six miles away. If this testimony is true, then the Roper, in order to reach the point of collision, and where the Sheres passed her at 8 o'clock, must have been at a point so far to the eastward of Body Island light that her course to the point of collision must have been about south-southwest. That is so certain that the libelant insists that that testimony as to the position of the Roper at dark cannot be accepted as true. His contention upon this point is that the Roper made Body Island light; and Lieut. Johnston the navigator, called as an expert, to whom was submitted Capt. Cranmer's testimony as to his courses from the time he left New York, shows that following such course he would have passed 14 miles east of Body Island light. In marking this course Lieut. Johnston allows "half a point variation which is west and half a point leeway which is west." If the wind was from the northwest or west, it is clear the leeway would be to the east, as that generally varies with the direction and duration of the wind. Drisko, mate of the Brown, testifies that at the time of the collision there was a half-mile current to the westward. Cranmer undoubtedly calculated to make Body Island light, and took a course for that purpose. When one considers the varying elements which affect a sailing vessel at sea, there is nothing in itself improbable or incredible in the story told by Cranmer that he was several miles to the eastward of where he expected to be. As has been well observed, a course at sea is not a railroad track. So many variable elements enter into it, it is so much affected by winds and currents, sometimes by the idiosyncrasies of the men at the helm, that a variation of five or six miles in the position of two vessels of like character sailing upon the same general course is not an improbability. It is true that Johnson, the man at the wheel on the Roper, in answer to libelant's question, "What time did you see Body Island light?" answers, "About 6 o'clock." It does not appear that he had ever been on that coast but once before; said he did not know how far off he was, and manifested a general ignorance of the locality which does not entitle his testimony to credence, contradicted as it is by all of the other witnesses on the Roper. Bulkley, who thought he saw a brightness in the direction where he was looking for a light, testifies that he went up into the rigging, but could not see a light; and Cranmer and other witnesses all testify that they saw no light,— Cranmer going to the masthead to look for it; and if Mount is to be believed, and he was about 16 miles from the light, and the Roper 5 or 6 miles to the eastward, it would be impossible for the Roper to have made Body Island light. The preponderance of the testimony that the Roper did not make Body Island light is so great that it compels me to accept as probably true the testimony of Mount and all the witnesses on the Roper that the Roper, about dark, was 5 or 6 miles from the Sheres, which was about 16 miles from Body Island light.

The case, then, stands thus: The libelant claims that the Roper was sailing on a south course, both lights being visible directly ahead for the distance of a mile and a half or two miles; that she came on that course head to head, or at most half a point off the starboard bow of the Brown, until within one or two lengths, when she luffed, and ran into her. The libelant's own expert witness testifies that upon that state of facts the collision could not have happened. It is impossible that the Roper should have struck the Brown at the point where all the testimony shows that she was struck. If she was dead ahead until within one or two lengths, and the luffing occurred one or two lengths off, her bow must have gone to the windward, and the Brown would have struck her on the port side; if the luffing occurred at any time before the bowsprits lapped, the point of collision would have necessarily been different from that established by the proof; if the luffing occurred after the bowsprits of the opposing vessels had passed each other, the Roper would have struck a glancing blow. It does not seem to me possible that the collision could have happened in the way it did happen if the Roper was on the course testified to by the libelant's witnesses. It follows, therefore, that she must have been on another course. If she was on a course southwest by south, and kept her course, and the Brown was on a north course, and kept her course, then the collision would have happened about as it did happen. The angle of collision, which is the only fact concerning which there is no material conflict in the testimony, becomes, therefore, confirmatory proof of the truth of the claimant's testimony. If the testimony is to be believed, which fixes the position of the Roper, just after sunset, at a point six miles to the eastward of the Sheres, she would have to sail a course southwest by south to reach the point of collision at the time she did reach it. To reject that testimony would be to assume that all the witnesses on the Roper have testified falsely, and that Mount has joined them in a conspiracy against the libelant. Such perjury and such conspiracy is not impossible, but there is nothing in this case which leads me to believe that it is probable. Here and there throughout the testimony there does appear some discrepancies to which I would be disposed to attach more weight if the story on the main point appeared intrinsically improbable, but there is nothing in the case which seems to make it improbable or impossible that the Roper should have been at the point stated, except the testimony offered by the libelant that she was seen a mile and a half north of the Brown, sailing on a course due south; and, as I have already stated, it is impossible to believe that testimony. If, then, it be assumed as proved that the Roper at sunset was at the point testified to, she would have been so far to the eastward that a course southwest by south would be the proper course for her in order to make Hatteras light. The testimony is that, sailing upon that course, the lookout, Johansen, reported a white light about seven or eight minutes before the collision. The master and mate and the seamen Lunt and Bulkley all testify to the hearing of this report, and to watching this light until three or four minutes before the collision, when the green light appeared. There is some testimony that the steward of the Brown

had a lantern on deck about that time, and that he went with it to
the lazarret to get some fish for breakfast the next morning, and it
is claimed that this lantern was placed upon the poop, and that it
was in a position to absorb the green light, so that the green light
was not visible until the Roper approached nearer. Some testimony
has been offered tending to show that it is impossible that this white
light should have had the effect claimed. That a white light has
greater intensity than a green, and that the effect of it in proximity
to a green light will be to render the green light invisible at a cer-
tain distance, is a fact in optics about which there can be no dis-
pute. But I attach little consequence to this point, as it has no bear-
ing upon the question of responsibility for this collision. It is con-
tended by the claimants that there is not sufficient proof that the
red and green lights of the Brown were burning. All the circum-
stances tend to satisfy me that they were, and the collision was in
no wise due to the absence of lights, or to the mingling of the green
and white lights, if there was such mingling. The green light was
visible, according to the claimant's witnesses, at least three or four
minutes before the collision, and this gave notice to the Roper as to
where the Brown was. The testimony of the Roper is that she kept
her course up to the very moment of the shock, the mate testifying
that immediately before the collision he gave the order "Hard down,"
and jumped to the wheel, and made three turns, but that nine turns
were needed to make it go round, and before the order was executed
the Roper struck the Brown. If this maneuver in extremis had been
actually accomplished, and the Roper was without fault up to that
time, under all the authorities that would have have been an error,
and not a fault; but under all the circumstances I am satisfied that
the course of the Roper was not changed. The preponderance of
testimony is that the Roper was on a southwest by south course,
which would be the proper course for her to make Hatteras light
from the position where she was at dark, if the wind was in the quar-
ter claimed; and it seems to me that the great preponderance of tes-
timony is that the wind was west by north, or west one-half north.
Not only is this proved to be so by the greater number of witnesses,
—for which I care little,—but such would be a fair deduction from
the aggregate of the weather reports. The master and mate of the
Brown are the only two witnesses testifying positively to the con-
trary, they fixing the direction of the wind, they say, by the com-
pass, as they had no vane on the ship. There is some discrepancy in
their testimony as to their exact location. They were sailing in the
dark, and it is easier to believe that they were mistaken in the direc-
tion of the wind than that all of the other witnesses, including Mount,
a disinterested witness. should be mistaken, confirmed as they are
in the main by the weather reports; and it may be proper to say that
the crew of the Roper, including two Swedes, who from their youth
are accustomed to the sea, and likely to be observant and generally
truthful, impressed me as being unusually intelligent for that kind
of vessel.

Some testimony has been offered as to the conduct of the crew of
the Brown, and of statements made by them, from which I am

asked to draw inferences unfavorable to them. There is also some testimony that the master and mate of the Brown were in the cabin examining charts, and that the crew were at the pumps at the time of the collision. My conclusion is reached without regard to testimony of this kind; nor is it shaken by the argument on behalf of libelant that the collision was due to a supposed race between the Roper and the Sheres, which so distracted the attention of the master and crew of the Roper that they ran into the Brown without seeing her until too late to avert it. Such theory has little support in the proofs or in the probabilities. To accept it requires me to believe that there was a deliberate conspiracy between Cranmer and Mount, supported by perjury, in which all of the crew of the Roper joined. It is passing strange that two vessels, with the broad Atlantic to move in, should, on a bright starlight night, with plenty of wind, but under no stress of wind, so conduct themselves as to bring about a collision; but the law which directs the movements of sailing vessels at sea is, like every other law, intended to be obeyed, and it ordains that the vessel having the right of way shall keep her course, at the peril of condemnation if she departs from it, and the certainty of acquittal if free from fault, although she may inflict mortal injury upon the opposing vessel. The fact of injury raises no presumption as to the fault one way or another. That is a matter of merest chance. If the Roper had arrived at the point of intersection a few seconds earlier, she would have been the sufferer. That she gave the blow instead of receiving it was pure accident; but the collision itself was not due to accident, but to fault, and the law demands that one who seeks compensation for injuries inflicted by another should prove the fault. My inclination, moved by a natural sympathy for the unfortunate, has been to find some ground upon which the loss might at least be divided, but I am constrained to hold that there is no testimony that would justify such conclusion. If the vessels were on a north and south course, with the wind from the quarter proved, both ships would have been running free, and the Brown, having the wind on the port side, should have kept out of the way. But the preponderance of testimony satisfies me that the Roper was closehauled on the starboard tack; and, if the Brown was closehauled on the port tack, the Roper had the right of way. The libel must, therefore, be dismissed.